IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
DAVENPORT DIVISION

JARED STEPHENSON,

      Plaintiff,

vs.

NANCY A. BERRYHILL, Acting
Commissioner of Social Security,[1]

      Defendant.

3:17-cv-00012-RGE-HCA

REPORT AND RECOMMENDATION

Plaintiff Jared Stephenson seeks review of a final decision of the Commissioner of the

Social Security Administration ("Commissioner") denying his claims for disability insurance

benefits ("DIB") under Title II and Supplemental Security Income Benefits ("SSI") under Title

XVI of the Social Security Act, 42 U.S.C. §§ 401–34; 1381–85. This Court reviews the

Commissioner's final decision pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). The case is before

the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). The Court

considers the matter fully submitted on the briefs.

---

[1] Nancy A. Berryhill, became the Acting Commissioner of Social Security on January 23, 2017.
Pursuant to Federal Rule of Civil Procedure 25(d), she is substituted for Carolyn Colvin as
Defendant in this suit, which may continue without further action. *See* 42 U.S.C. § 405(g) ("Any
action instituted in accordance with this subsection shall survive notwithstanding any change in
the person occupying the office of Commissioner of Social Security or any vacancy in such
office.").

# I.

## PRIOR PROCEEDINGS

Stephenson protectively filed his present claims for DIB and SSI benefits claim on January 21, 2014, alleging disability since October 15, 2007. (AR at 13, 80, 94, 108, 109).[2] He alleged disability due to a learning disorder and shakes and tremors. (AR at 80). The Social Security Administration ("SSA") denied his claims initially and on reconsideration. (AR at 92, 106, 108, 109, 123, 138, 140-150, 156-173). Stephenson requested an administrative hearing. Administrative Law Judge ("ALJ") Shreese M. Wilson conducted an administrative hearing on September 29, 2015. Stephenson appeared with his attorney Michael DePree; vocational expert Teresa McClain also appeared and testified. The ALJ found Stephenson was not disabled on February 2, 2016. (AR at 10-32). Stephenson requested a review of the ALJ's decision. (AR at 7). The Appeals Council denied the request for review and the ALJ's decision became a final decision on January 26, 2017. (AR at 1–5). Stephenson timely filed the Complaint [1] in this case on March 1, 2017.

### A.     Educational and Vocational Factors

Stephenson was 36 years old when he filed for benefits.[3] (AR at 80, 94). His highest level of education was the eleventh grade in high school. (AR at 50).  He had worked as a sandwich maker, ticket taker, and hand packager. (AR at 340).

---

[2] All citations are to the administrative record.

[3] In his decision, the ALJ noted that Stephenson had filed prior applications for DIB and SSI benefits on March 13, 2009, which were denied. To the extent the present applications were viewed as an implied request for reopening of the prior applications because the alleged date of onset fell during the previously adjudicated period, the ALJ found the record did not establish a reason to reopen the prior applications and evidence from the previously adjudicated period was considered only to the extent reflective on Stephenson's "functioning and entitlement to benefits during the relevant period." (AR at 13–14).

**B.    Medical Evidence**

1.    Medical Records

Stephenson's medical records are limited. On February 12, 2009, Stephenson reported to Community Health Care (CHC) in Davenport, Iowa, complaining of "spells" of dizziness and the feeling of things moving, and that his limbs felt like they were twitching. (AR at 357). He also reported his hands were twitching all the time. The episodes had occurred six times in the previous two months. He did not lose consciousness or fall. He reported the episodes occurred when he was reading after about five minutes of reading. (*Id.*) His physical examination was normal but Dr. Oludamilola Ogunlesi referred him for an EKG, CBC, CMP, thyroid stimulating hormone, EEG and CT scan of the head. (*Id.*) The doctor requested that Stephenson follow up after the tests were done, but there is no record of any follow-up, only the test results. (*Id.*) The CT scan performed February 23, 2009, showed sinusitis, but otherwise was negative. (AR at 367). An EKG was normal, except for rate (AR at 368) and labs were normal. (AR at 358-359).

Stephenson was next seen at CHC on September 22, 2010, and had a lumbar spine x-ray taken after he complained of back and left hip pain. (AR at 366). In comparison to an x-ray taken March 17, 2009, no compression fracture or malalignment was seen and there was an unchanged L5-S1 disk space narrowing, as well as asymmetry of the left iliac wing which was consistent with a "large incidental sessile osteochondroma." (*Id.*) There are no other records concerning this visit. Stephenson followed up with a visit to the CHC clinic on September 30, 2010, complaining of continued pain in his lower back. (AR at 356). He told Dr. Ogunlesi he had pain daily in his left lower back that he rated at 10/10 in intensity. (*Id.*) No trauma had occurred and he had not been doing any heavy lifting. (*Id.*) Stephenson reported he sometimes had a tingling sensation in his left leg below the knee, but no numbness. (*Id.*) Dr. Ogunlesi reviewed the x-ray from September 22.

On physical examination, Stephenson had tenderness over the left lower back immediately above the iliac crest, no midline tenderness and negative straight leg raise bilaterally. Neurologically, he was alert and oriented to time, place, and person and sensation was intact to both lower extremities. Dr. Ogunlesi's impression was low back pain most likely from acute strain. He prescribed Flexeril and ibuprofen as needed and did not believe there was a need for an MRI, as no radicular symptoms were present. (*Id.*)

At a follow-up visit on October 7, 2010, Stephenson could ambulate, but stated it did not feel normal when he walked, that he needed to support himself when he initially got out of bed in the morning, but then could walk without support. He described intermittent paresthesias in his left lower extremity, but no incontinence. (AR at 355). On physical examination, Dr. Ogunlesi noted erythematous[4] in the left lower back, negative straight leg raise on the right, but pain in the lower back with straight leg raise to 60 degrees. Muscle strength was 5/5 in both lower extremities and there was no objective weakness or sensory loss. (*Id.*) Dr. Ogunlesi recommended further evaluation with an MRI of the lumbar spine and an x-ray of the left hip based on Stephenson's complaint of pain with external rotation of the left hip. (*Id.*)

An MRI was performed on October 14, 2010. (AR at 363). It showed moderate to large central disk protrusion at L4-5 and moderate-sized lateral disk protrusion extending in to the neural foramen at L5-S1. (*Id.*) At a follow-up exam on October 15, 2010, Dr. Ogunlesi noted that the MRI showed a disc protrusion was compacting the lumbar nerve root. (AR at 354). He recommended Stephenson see a neurosurgeon for an opinion and started Stephenson on Tramadol for his pain. (*Id.*) There are no records concerning any follow-up on this medical issue.

---

[4] Inflammation. http://www.dictionary.com/browse/erythematous.

A final medical record from Dr. Ogunlesi was from a visit on July 3, 2011, after Stephenson cut his finger. (AR at 352-353). The cut was closed with stitches and Stephenson was discharged. (*Id.* at 353).

Other records from Genesis Medical Center include an x-ray and treatment after Stephenson sustained a rolling injury to his right ankle on September 24, 2014. (AR at 446–50). Stephenson also was seen at Community Health Care on January 21, 2015, to assess his complaints of body tremors/shakes and low back pain. Labs were drawn to assess his tremors with further management dependent on results. (AR at 430–35). A lumbar spine x-ray on January 28, 2015, was normal. (AR at 428, 444).

2.      Mental Health Records

Stephenson presented at Vera French Community Mental Health Center on August 4, 2014, complaining of depression. (AR at 390). Richard Quarton, Ph.D., interviewed Stephenson, who at that time was living with friends. He was unemployed "in part due to his medical issues." Dr. Quarton noted Stephenson stammered at times, presented in a "somewhat anxious way and had some pressured speech." (*Id.* at 390–91). Stephenson reported sleeping problems. He was disheveled in appearance, oriented to person, place, time, and situation,and demonstrated unremarkable behavior and psychomotor behaviors. His speech was slurred and he stammered. His affect was flat and his mood labile, anxious, and depressed. Stephenson's memory was intact, he had clear consciousness, and his intellect was average. (*Id.* at 391). His attitude was discouraged, attention was gained and maintained, reasoning and judgment fair, and impulse control and insight poor. (*Id.*) Stephenson's self-perception was realistic, his thought processes logical, thought content unremarkable, and he was not showing signs of suicidal or homicidal ideation. (*Id.*) Stephenson had been referred by his disability lawyer. He reported he was a social

5

drinker, smoked cigarettes, and occasionally smoked marijuana. (*Id.*) Stephenson told Dr. Quarton he occasionally got angry and would throw himself into walls and sometimes blurted out negative comments to friends. Stephenson felt he was doing better with his temper. (*Id.*) He reported it hurt to walk and if he was active he experienced chest pains. He also stated he would "space out and forget things" and was a procrastinator. (*Id.*) Stephenson blamed himself for his father's suicide, had some symptoms of Adult ADHD, and cut himself as a youth. He was in foster care as a child for unknown reasons. (*Id.*) Dr. Quarton diagnosed Stephenson with Unspecified Depressive Disorder, moderate and to rule out unspecified ADHD. The goal of treatment was to assist with his depressive symptoms so they did not impair his daily functioning. (*Id.* at 392).

On August 13, 2014, Stephenson returned for therapy. (AR at 393). He was depressed and angry and Dr. Quarton tried to identify the sources of Stephenson's anger. Stephenson still stammered, but was more relaxed, had better mood, and was more talkative. (*Id.*)

Heidi Bradley, ARNP conducted a Psychiatric Evaluation of Stephenson on September 11, 2014. (AR at 395). His chief complaint was that he had an anger problem and "people say I'm depressed." (*Id.*) Ms. Bradley noted Stephenson had "tremors and twitches" in the lower aspect of his face, which he reported he had had since he was a child. (*Id.*) His past psychiatric history included treatment at Vera French from the age of 9 for a diagnosis of ADHD, for which he received Prozac and Ritalin. (*Id.* at 396). He reported three past psychiatric hospitalizations at ages 13, 18, and in his early 20's when he had depression with suicidal ideation. (*Id.*) He also cut himself as a teenager and as a young adult had stabbed his arm when he got angry. (*Id.*) Stephenson reported he had an 11th grade education and was in special education classes in high school, but did not do well and had significant academic and behavioral issues. (*Id.*) He was unemployed and last worked at Burger King in 2008. (*Id.*) He reported past arrests for verbal assault, public

6

intoxication, interfering with official acts, and failing to appear, but had no legal constraints at the time of the evaluation. (*Id.*) He reported pain in his left knee, but otherwise no other physical problems. (*Id.*) Stephenson reported past alcohol and marijuana use (as recently as one to four months before the evaluation respectively), drinking four to five caffeinated sodas daily, and smoking approximately a half pack of cigarettes a day. (*Id.* at 397). Stephenson told Ms. Bradley he had had been physically and emotionally abused by his stepfather and was molested by a cousin in the past. (*Id.*)

On mental status exam, Stephenson was appropriately dressed and groomed. (AR at 397). He was slightly restless and he had some abnormal movements of his mouth and the lower aspect of his face. (*Id.*) His mood was neutral and affect slightly constricted, "appropriate to conversation, and congruent with mood." His speech was of "normal rate, quantity, and volume" with some occasional stuttering when he tried to express himself. (*Id.*) Stephenson denied auditory hallucinations or paranoia, but acknowledged some odd thoughts such as he should "kick babies," thoughts on which he had not acted. His thought processes were logical and goal-directed with no loosening of associations. (*Id.*) He denied suicidal or homicidal ideation, but admitted to past harmful thoughts and attempts. (*Id.*) Stephenson was alert and oriented with fair eye contact and minimal insight into his current problem. He appeared to have fair to poor judgment. (*Id.*) His gait and station were unremarkable. His recent and remote memory were both impaired; his concentration and attention span slightly impaired. (*Id.*) Ms. Bradley could not determine whether Stephenson's inability to spell "world" backwards or to do serial 7's was based on his below average intellectual functioning or was secondary to poor concentration and attention. She could identify no language impairments or barriers. Stephenson's abstractive capacity was impaired and his intellectual functioning was below average.

Ms. Bradley's impression was that Stephenson had "some elements of Antisocial Personality Disorder," unspecified depressive disorder, mild intellectual disability, and history of ADHD. (AR at 397). She recommended he start Zoloft along with Risperdal and he was to follow up in four weeks to evaluate the effectiveness of the medication. (*Id.* at 398).

Stephenson returned to Vera French on October 9, 2014, to follow up on his depression. (AR at 400). He reported his friends thought he was more "mellow" and better, but he did not like the medications. He had improved eye contact and appeared less anxious. (*Id.*)  Stephenson still had sleep difficulties. His affect was "a bit brighter" and he offered "more spontaneous conversation." (*Id.*) On mental status exam, he was appropriately dressed and groomed and still slightly restless, but improved from before. (*Id.*) His facial movements appeared unchanged, but Stephenson thought they were worse. His mood was neutral and affect a little brighter. (*Id.*) His speech was normal rate, quantity, and volume with some occasional stuttering. He denied auditory hallucinations or paranoia and reported his thoughts about kicking babies were gone. (*Id.*) His thought processes were logical and goal-directed with no loosening of associations. He denied suicidal or homicidal ideation. Stephenson was alert and oriented with improved eye contact. He demonstrated limited insight into his current problem, his judgment was fair to poor. (*Id.* at 400–01). Stephenson's gait and station were unremarkable. His concentration and attention span were within normal limits and he demonstrated no language impairments or barriers. (*Id.* at 401). Ms. Bradley reduced the amount of Risperdal in response to the complaint Stephenson's tremors/tics were worsened to see if that reduced the worsening, while remaining effective with respect to "intrusive, negative thoughts." (*Id.*) His Zoloft prescription was continued and Ambien was added to help with sleep issues. Stephenson was to return for a medication check in a month. (*Id.*)

On November 16, 2014, Stephenson reported for a scheduled appointment at Vera French. (AR at 403). He reported improved mood, he felt better and was "pleasantly surprised by the improvement." (*Id.*) He reported some continued irritability after he ran out of medication, but had been compliant with medication before running out. (*Id.*) Stephenson reported his friends noticed when he had not taken his medication. His eye contact was improved and the tremors of his hands and lower jaw were minimal, Stephenson reporting they had improved with the reduction of Risperdal. (*Id.*) He denied intrusive thoughts, his affect was improved and he demonstrated some humor. Stephenson did not like the medications and did not know if he wanted to feel "mellow." (*Id.*) He continued to have sleep difficulties and stopped taking Ambien as it was not helping. He requested an alternative sleep medication. (*Id.*) On mental status exam, Stephenson was appropriately dressed and groomed. His psychomotor activity was within normal limits with continued abnormal movements of his mouth and lower aspect of his face, unchanged from his initial visit. (*Id.*) His mood was euthymic, affect full, congruent with mood and appropriate to conversation. His speech was normal rate, quantity, and volume with some stuttering. He denied auditory hallucinations or paranoia and his past odd thoughts remained absent. His thought processes were logical and goal-directed with no loosening of associations. He denied suicidal or homicidal ideation. (*Id.*) Stephenson was alert and oriented with good eye contact, much improved. He had some insight into his current problem and fair judgment. His gait and station were unremarkable. His concentration and attention span were within normal limits and there were no language impairments or barriers. (*Id.* at 404). Ms. Bradley's impression was that Stephenson was much improved, less depressed, smiled easily, and had improved eye contact. (*Id.*) They discussed increasing his dosage of Zoloft to address the irritability and started Trazodone for sleep. (*Id.*)

Stephenson returned to Vera French on December 4, 2014, for a scheduled appointment. (AR at 407). He reported increased difficulties after he ran out of his medication for about a week and did not know how to get it refilled. He felt more restless and irritable and his tics/twitches were more pronounced. (*Id.*) He felt the increase in Zoloft and addition of Trazodone had helped. (*Id.*) On mental status exam, Stephenson was appropriately dressed and groomed with restless and fidgeting psychomotor activity and some abnormal movements of his mouth and lower aspect of his face, which were more prominent than his last visit. (*Id.*) His mood was anxious with constricted affect, congruent with mood and appropriate to conversation. His speech was normal rate, quantity, and volume with some stuttering. He denied auditory hallucinations or paranoia, intrusive thoughts/delusions. His thought processes were logical and goal-directed with no loosening of associations. He denied suicidal or homicidal ideation. (*Id.*) Stephenson was alert and oriented with fair eye contact and some insight into his current problem. His judgment was fair. His gait and station were unremarkable. His concentration and attention span were within normal limits and he had no language impairments or barriers. (*Id.*) Ms. Bradley reviewed with Stephenson how to get refills and reviewed the importance of compliance with medications. (*Id.* at 408).

At a December 9, 2014, individual therapy visit, his first with Dr. Quarton since mid-August, Stephenson requested referral to another therapist. (AR at 411). His mental status was unchanged. (*Id.*)

Stephenson presented for a scheduled appointment at Vera French on January 19, 2015. (AR at 413). He reported doing "much better" after getting back on his medications. Ms. Bradley noted he appeared much more relaxed and his tics/tremors had improved. He felt his medication was beneficial, but was still having sleep problems. (*Id.*) On mental status examination, Stephenson was appropriately dressed and groomed. His psychomotor activity was within normal

limits with some abnormal movements of his mouth and lower aspect of his face unchanged from his initial visit. (*Id.*) His mood was neutral with full affect, congruent with mood and appropriate to conversation. His speech was normal rate, quantity, and volume with some occasional stuttering. He denied auditory hallucinations, paranoia, or intrusive thoughts. His thought processes were logical and goal-directed with no loosening of associations. He denied suicidal or homicidal ideation. (*Id.*) Stephenson was alert and oriented with good, improved eye contact and some insight into his current problem. His judgment was fair. His gait and station were unremarkable. His concentration and attention span were within normal limits and there were no language impairments or barriers. (*Id.*) Ms. Bradley increased his dosage of Trazodone for sleep and increased his dosage of Zoloft. (*Id.* at 414).

At a scheduled appointment at Vera French on February 16, 2015, Stephenson reported doing "pretty well" with an episode of going out with his brother, drinking alcohol, and getting into a fight. (AR at 416). He was feeling calm and was pleased with his medications, except Trazodone was not helping with sleep. His mental status examination was consistent with the previous month. (*Id.*) Ms. Bradley maintained Stephenson's dosages of Risperdal and Zoloft, discontinued Trazodone, and added a prescription for Restoril for sleep. (*Id.* at 417).

On February 18, 2015, during a scheduled appointment at Vera French for individual therapy with Jerry Lowe, LISW, Stephenson reported having problems with grief during the month of January, a year after his mother died. (AR at 419). They discussed his issues with his father's death by suicide and Lowe provided support. (*Id.*) Lowe noted no change in Stephenson's mental status. (*Id.*)

During a March 5, 2015, individual therapy session with Mr. Lowe, Stephenson had no change in mental status. (AR at 421). He reported he had received a letter from disability seeking

specific information. He reported some interaction with his paternal uncle's family, that he was watching television and movies a great deal, and not going to sleep until 4:30 a.m. and sleeping until 9:30 or 10 a.m. (*Id.*)

### C.    Medical Source Opinions/Evaluations

Several consultative examination reports were part of the administrative record, including one from a prior benefits application.

On April 22, 2009, Dr. Phillip L. Kent, licensed psychologist, assessed Stephenson. (AR at 452–56). Dr. Kent noted Stephenson had no prior treatment history. (*Id.* at 452). In an Adult Function Report provided to Dr. Kent, Stephenson indicated he was living in his grandfather's basement and was unemployed. He reported sleeping four hours a day, having difficulty with motivation, wearing the same clothes for a week, and did not have a driver's license. He liked to watch movies, play games, or go to the bar and watch wrestling. (*Id.*) Dr. Kent took a psychosocial history from Stephenson, which included a sporadic work history and use of marijuana when he had the money. (*Id.* at 453). On mental status examination, Stephenson was casually dressed in sweatpants and a hooded sweatshirt, maintained poor eye contact and chewed gum, slouched in his chair and had "somewhat of a defiant attitude." (*Id.* at 454). His facial expression was flat and body movements appeared slowed. His affect was blunted and he experienced mood swings, from depression and not wanting to do anything to anger expressed in punching walls and throwing things. (*Id.*) He reported three hospitalizations. (*Id.*) Dr. Kent noted Stephenson did not have problems with attention span during the interview, his thinking was notably concrete, and intelligence appeared dull. (*Id.*) He lacked insight and blamed others for his problems. Dr. Kent noted Stephenson's fingers and fingernails were dirty, his clothes appeared to have been worn for several days and he needed a shave. (*Id.*) No obvious memory impairments were displayed nor

12

were there unusual thought content or signs of psychosis. (*Id.*) Dr. Kent administered the Wechsler Adult Intelligence Scale-Fourth Edition on which Stephenson put forth "adequate effort." (*Id.*) His full scale IQ was 72. His overall intellectual functioning fell in "the borderline range of intellectual functioning" and was consistent with his low academic achievement and behavior problems in school. The test results also indicated Stephenson thought "quite slowly compared to the general population." (*Id.* at 455). Based on his interview and the test results, Dr. Kent assessed Stephenson with bipolar disorder, NOS, cannabis abuse, borderline intellectual functioning, personality disorder, NOS with negativistic and antisocial traits. His GAF was 55. (*Id.* at 456). Dr. Kent referred Stephenson to a local mental health center to address his mood disorder. (*Id*). He indicated Stephenson did not appear to be impaired in his ability to understand directions, although he might have some difficulty remembering due to working memory and attention problems. Dr. Kent found it "noteworthy" Stephenson was able to work at a fast food restaurant for nearly a year as an indication that "if he really wants to, he likely is able to get along at least superficially with supervisors, co-workers, and exercise adequate judgment." (*Id.*) Dr. Kent did not believe he could handle cash benefits. (*Id.*)

Dr. Roger Mraz, Ph.D., conducted a psychological evaluation on April 2, 2014. (AR at 373–76). Dr. Mraz took a history similar to Dr. Kent's. (*Id.* at 373–74). On mental status exam, he noted Stephenson arrived on time and was "somewhat disheveled." (*Id.* at 374). His speech was easy to understand and his thoughts goal-directed, with no evidence of loose associations or tangential thinking. His mood was depressed and affect restricted. (*Id.*) Stephenson scored 21 out of 30 on the Mini Mental State Exam. On the Beck Depression Inventory-II, Stephenson chose moderate to severe symptoms of depressions. (*Id.*) He reported a long history of anger control problems. (*Id.*) On the Connors Rating scale, Stephenson reported significant problems with

attention span, hyperactivity and impulsivity. (*Id.* at 375). He had problems focusing his attention concentrating and remembering, and was easily distracted. He said he was impulsive and said and did things without thinking. Dr. Mraz found Stephenson's math skills at the early elementary school level and his reading and writing skills at late elementary school level. (*Id.* at 375). The results of the evaluation were consistent with a childhood diagnosis of ADHD and depression. His symptoms of Intermittent Explosive Disorder had a negative impact on his employability. Although Stephenson had moderate problems with delayed memory and working memory, he could remember and follow simple instructions, although the prior evaluation indicated an impairment in processing speed. (*Id.*) Dr. Mraz found his judgment to be poor and questioned Stephenson's ability to manage funds, particularly in view of his history of substance abuse. (*Id.*) His final diagnosis was Intermittent Explosive Disorder, Major Depressive Disorder, Attention-Deficit/Hyperactivity Disorder, Combined Type, Cannabis and Alcohol Abuse and Nicotine Dependence with Antisocial Personality Traits. (*Id.* at 376).

Finally, on April 19, 2014, Dr. Stanley Rabinowitz, M.D., saw Stephenson for a physical examination. (AR at 378–84). Stephenson's chief complaint was "shakes and twitches." (*Id.* at 380). He reported he had complained of these for years. Previous CT scan and EEG had been normal. (*Id.*) About two years before the examination he also started having left lower extremity numbness and low back pain, which radiated down his left leg and was prominent with activity. (*Id.*) He only took Ibuprofen for relief. His educational and social history were the same as reported to Drs. Kent and Mraz. (*Id.*) On physical examination, his speech was clear and understandable, hearing grossly normal, and he walked without help of an assistive device. (*Id.* at 381). Stephenson was obese. Range of motion testing of his joints and spine was performed; all were within normal limits. (*Id.* at 378, 384). Stephenson demonstrated no active joint inflammation, deformity,

14

instability, contracture or paravertebral muscle spasm. (*Id.* at 382). Straight leg raising was

negative at 90 degrees both sitting and supine. (*Id.*) Grip in both hands was normal and

Stephenson's digital dexterity was not impaired. He had no difficulty getting up and down from

the examining table, but had "mild difficulty" squatting three-quarters of the way down. His cranial

nerves II-XII were grossly intact. (*Id.*) His reflex and motor strength testing was normal and there

was no evidence of atrophy. (*Id.*) On mental status exam, Stephenson was fully oriented, his

memory intact and his appearance appropriate. (*Id.*) He had no behavioral difficulties during the

examination and was able to relate during the examination. (*Id.*) Dr. Rabinowitz believed

Stephenson could handle his own funds. His final impression was history of tremulousness,

etiology undetermined; chronic low back pain with questionable left lower extremity

radiculopathy; history of learning disability; history of polysubstance abuse that was inactive and

exogenous obesity. (*Id.*)

### D.    Hearing Testimony

At hearing on September 29, 2015, Stephenson was 38 years old. (AR at 45). He was 5'11"

and weighed 289-290 pounds. He was right handed, but also used his left hand. (*Id.* at 46).

Stephenson was single and had two children that he did not see; he had recently signed over

parental rights to one child. (*Id.* at 46–47). He lived in a mobile home with friends. (*Id.* at 47). He

did not have a driver's license and had never had one. (*Id.* at 47–48). Stephenson was transported

by one of his roommates and before that by his mother. (*Id.* at 48). He smoked cigarettes and

smoked marijuana, although not as often as he did not have the money to buy it. (*Id.* at 48–49). He

estimated he smoked it once a month and only drank alcohol at poker games, which he had quit

playing. (*Id.* at 49). In the last year he had played about five games when he got spotted money to

get into the game. (*Id.*) Stephenson completed the eleventh grade and did not get his GED. (*Id.* at

50). The source of income to run the household where he lived was income from his roommates and food stamps from Stephenson. Stephenson had a state medical card which he obtained after talking to his attorney the first time, maybe May 2014. (*Id.* at 50–51).

In the past, Stephenson had worked as a ticket taker for security companies and worked as a cook in a fast food restaurant. (AR at 51). The last time he worked was 2008 or 2009. (*Id.* at 52).

At the time of hearing Stephenson was not taking pain medication for his back. (AR at 52–53). He last saw a doctor for his back about a month before the hearing, but was told there was nothing wrong. (*Id.* at 53). No physical therapy or medication was prescribed. (*Id.* at 54). The pain fluctuated from his lower back to his left leg. There was nothing that caused his back pain to be more severe, but he was not as active now. (*Id.*) He alternated sitting and standing to ease the pain and tried heating pads, which only soothed for a bit. (*Id.* at 55).

Stephenson estimated he could lift 25 to 30 pounds with both hands. (AR at 55). He did not use a cane or assistive device to walk. He estimated he could walk about a mile in a couple of hours. (*Id.* at 56). He thought he could stand no longer than an hour before he had to sit down and sit for an hour before he had to stand. (*Id.* at 56-57). After sitting for an hour he got pain in his hip that would come and go and shoot down his left leg. (*Id.* at 57). The doctors had not recommended any treatment for his pain. (*Id.* at 58).

Stephenson treated with Vera French Community Mental Health for his bipolar disorder. (AR at 59). Dr. Heidi Bradley prescribed his medications but he had not seen her since May or June before the hearing. (*Id.*) He was taking Risperdal, Trazadone, and Sertraline. (*Id.*) Stephenson testified sometimes his medication made him nauseous; otherwise, the medication was helping with his shakes and tremors and "snapping" at random at people. (*Id.* at 60).

Stephenson testified he used to donate plasma to acquire marijuana and alcohol, but stopped in the last year as it made him too shaky. (AR at 60).

Stephenson had lived with his friends since his mother died at the beginning of the year. (AR at 61). He got along with them, as well as with the friends he played poker with across the street. (*Id.*) Stephenson testified on a normal day he watched a lot of TV, could cook for himself but had to be careful slicing things, and could grocery shop when his roommate went with him so he shopped more economically. (*Id.* at 62). His roommate would take his laundry to do with theirs at the laundromat. (*Id.* at 62–63). He did not have the patience to sit at a laundromat. (*Id.* at 63). When living with his mother he did the laundry now and then. He could do dishes, take out the trash, and mow part of the yard. (*Id.*) He had recently started a Facebook account and played videogames at a neighbor's for a couple of hours two or three times a week. (*Id.* at 63–64). He did not need help dressing or with personal hygiene, although he recently had been asking for help shaving his face because of his tremors. (*Id.* at 64). Stephenson estimated he slept four to four-and-a-half hours at night and slept a few hours during the day. (*Id.*)

In response to questions from his lawyer, Stephenson testified he could stand a total of no more than four hours a day because of his pain. (AR at 65–66). He last washed the clothes he wore to the hearing the week before and last bought new clothes seven years before. (*Id.* at 66). He had been told at every job he did not work fast enough. (*Id.*) He lost his job at Wendy's when he snapped at a customer in front of other customers. (*Id.*) He lost his job at Burger King based on a lack of hygiene. (*Id.* at 66–67). Stephenson had a facial tick or tremor that he had since he was born, but it was getting more noticeable. (*Id.* at 67). He once lived in an efficiency apartment on his own for six months. His uncle helped him pay for it. (*Id.* at 67). Stephenson was in special education for all his classes. (*Id.* at 68).

The vocational expert ("VE"), Teresa McClain testified next. (AR at 68). The ALJ posed a hypothetical involving an individual with the same age, education, and work history as Stephenson with no exertional, postural, manipulative, environmental, or visual limitations, but the individual would be limited to tasks that could be learned within 30 days that were routine and repetitive in nature, the environment had to be free of hourly production quotas, although there might be a production expectation by the end of the shift or day. (*Id.* at 70). The VE gave the opinion that none of Stephenson's past jobs could be performed. (*Id.*) There would be jobs available such as industrial cleaner, laundry worker, and router. (*Id.* at 70–71). Changing the hypothetical to limit the individual to lifting and carrying 30 pounds occasionally and 25 pounds frequently, the router job could still be done. (*Id.* at 71). In addition, with the lifting limitation, there would be jobs available as motel cleaner and folding machine operator. (*Id.*) With the addition to the hypothetical that the individual needed to be able to alternate between sitting and standing at least one time every hour during an eight-hour work day and stay in the alternating position for up to five minutes, the router job could still be done, but at reduced numbers. With these limitations, other jobs which could fit the hypothetical included office helper and routing clerk. (*Id.* at 72). With the addition of a limitation to no more than occasional interaction with the general public, coworkers, or supervisors due to an anger issue, the VE testified the router, office helper, and routing clerk jobs could still be done with occasional or less contact. (*Id*. at 72–73). Finally, if the individual worked at a slower pace, the jobs could not be maintained. (*Id.* at 73).

In response to questions from counsel, the VE testified an individual who might distract coworkers in the work setting might get warnings, but then the conduct would not be tolerated. (AR at 73–74). If the same individual could not respond to criticism appropriately or accept instructions consistently, again they might get warnings and then would be let go. (*Id.* at 74). With

18

respect to the hypothetical regarding freedom from hourly production quotas, the VE agreed the individual might work slower at times, but would have to catch up to have things done for the end of the day. (*Id.* at 74–75).

## II.    FINDINGS OF THE COMMISSIONER

In order to qualify for benefits under the Act, Stephenson must have been disabled. "Disability is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). The Commissioner uses the following five-step evaluation to determine whether a claimant is disabled within the meaning of the Act and therefore eligible for disability benefits: "whether the claimant is (1) currently employed and (2) severely impaired; (3) whether the impairment is or approximates a listed impairment; (4) whether the claimant can perform past relevant work; and if not, (5) whether the claimant can perform any other kind of work." *Byes v. Astrue*, 687 F.3d 913, 915 n.2 (8th Cir. 2012)(quoting *King v. Astrue*, 564 F.3d 978, 979 n.2 (8th Cir. 2009)). If at step (4) the ALJ makes a finding that a claimant is unable to perform his/her past relevant work, the burden shifts to the Commissioner to prove with medical evidence the claimant" has a residual functional capacity to do other kinds of work, and that other work exists in significant numbers that [claimant] can perform." *Nalley v. Apfel*, 100 F. Supp. 2d 947, 952-53 (S.D. Iowa 2000)(citing cases).

Following the requisite five-step evaluation, the ALJ issued the written decision at issue in this case on February 2, 2016, and made the following findings:

1.    The claimant meets the insured status requirements of the Social Security Act through September 30, 2011.

2.      The claimant has not engaged in substantial gainful activity since October 15, 2007, the alleged onset date (20 C.F.R. 404.1571 *et seq.* and 416.971 *et seq.*).

3.      The claimant has the following severe impairments: depressive disorder, intellectual disability, antisocial personality disorder, degenerative disc disease of the lumbar spine, degenerative joint disease of the left hip, and obesity (20 C.F.R. 404.1520(c) and 416.920(c)).

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except: lifting or carrying thirty pounds occasionally and twenty-five pounds frequently; individual needs the opportunity to alternate between sitting and standing, if standing they need to be able to sit, if sitting they need to be able to stand, and the frequency of the alternation would need to happen at least one time every hour throughout the course of an eight-hour workday but they remain in the position for five minutes for tasks that might be designated; limited to tasks that can be learned within thirty days that are routine and repetitive in nature; individual should be in an environment that is free of hourly production quotas all though [sic] there might be a production expectation by the end of a shift or day; and limited to no more than occasional interaction with the general public, coworkers or supervisors.

6.      The claimant has no past relevant work (20 C.F.R. 404.1565 and 416.965).

7.      The claimant was born on May 18, 1977 and was 30 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 C.F.R. 404.1563 and 416.963).

8.      The claimant has a limited education and is able to communicate in English (20 C.F.R. 404.1564 and 416.964).

9.      Transferability of job skills is not an issue because the claimant does not have past relevant work (20 C.F.R. 404.1568 and 416.968).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R. 404.1569, 404.1569(a), 416.969 and 416.969(a)).

11.    The claimant has not been under a disability, a defined in the Social Security Act, from October 15, 2007, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(AR at 10–27).

## III.   STANDARD OF REVIEW

This Court "will affirm the ALJ's findings if supported by substantial evidence on the record as a whole." *Perkins v. Astrue*, 648 F.3d 892, 897 (8th Cir. 2011)(quoting *Medhaug v. Astrue*, 578 F.3d 805, 813 (8th Cir. 2009)); *see also* 42 U.S.C. § 405(g)("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."); *Kamann v. Colvin*, 721 F.3d 945, 950 (8th Cir. 2013); *Young v. Astrue*, 702 F.3d 489, 491 (8th Cir. 2013).

> Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion. To determine whether substantial evidence supports the decision, we must consider evidence that both supports and detracts from the decision. If substantial evidence supports the ALJ's decision, we will not reverse the decision merely because substantial evidence would have also supported a contrary outcome, or because we would have decided differently.

*Wildman v. Astrue*, 596 F.3d 959, 963-64 (8th Cir. 2010)(internal citations and quotation marks omitted); *see Phillips v. Colvin*, 721 F.3d 632, 625 (8th Cir. 2013); *Kamann*, 721 F.3d at 950; *Young*, 702 F.3d at 491. The Court will not overturn the ALJ's decision as long as the decision "falls within the available zone of choice." *Buckner v. Astrue*, 646 F.3d 549, 556 (8th Cir. 2011); *Heino v. Astrue*, 578 F.3d 873, 879 (8th Cir. 2009)(quoting *Bradley v. Astrue*, 528 F.3d 1113, 1115 (8th Cir. 2008)). "The ALJ's decision 'is not outside the zone of choice simply because [the Court] might have reached a different conclusion had [the Court] been the initial finder of fact.'" *Heino v. Astrue*, 578 F.3d at 879 (quoting *Bradley*, 528 F.3d at 1115); *see Buckner*, 646 F.3d at 556. If two inconsistent positions may be drawn from the evidence and one of those positions represents

the agency's findings, the Court must affirm the agency. *Chesser v. Berryhill*, 858 F.3d 1161, 1164

(8th Cir. 2017).

## IV.   DISCUSSION

**Stephenson** raises three challenges to the ALJ's decision: (1) the ALJ erred in failing to

assess whether Stephenson equaled the listing for intellectual disability at Step Three; (2) the

ALJ's RFC and hypothetical to the VE failed to include Stephenson's mental limitations; and (3)

the ALJ's hypothetical to the VE failed to specify the frequency with which Stephenson must

alternate between sitting and standing. The Commissioner responds there was substantial evidence

to support the ALJ's findings.

A.   <u>Step Three Finding</u>

At hearing and in his brief, Stephenson argues that the ALJ should have found at Step

Three that Stephenson met or equaled Listing 12.05(C) and therefore was disabled as a matter of

law.

Listing 12.05(C) requires defines "Intellectual Disability":

Intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; *i.e.*, the evidence demonstrates or supports onset of the impairment before age 22.

The required level of severity for this disorder is met with the requirement in A, B, C, or D are satisfied.

. . .

C.  A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional or significant work-related limitation of function.

20 C.F.R. Pt. 404, Subpt. P, App. 1. Stephenson had an IQ score of 72, a test result obtained after

the age 22. (AR at 455). Judge Wilson found the paragraph C criteria of the listing were not met

because Stephenson's test score was above the 60 to 70 range; Stephenson did not "provide objective findings of cognitive or borderline functioning during his formative years" aside from participation in special education classes, and did not "provide valid IQ testing showing his IQ was at the listing level during his formative years." (AR at 19).

Stephenson argues Judge Wilson was required to and failed to consider the applicable Program Operations Manual System (POMS) provision in determining whether Stephenson's IQ score of 72 coupled with another impairment (Stephenson's depressive disorder, antisocial personality disorder, degenerative disc disease, degenerative hip joint disease and obesity) met or equaled Listing 12.05(C). (Pl. Br. [9] at 11). He further argues the ALJ ignored the evidence that Stephenson's mental impairment began before age 22 and erroneously required Stephenson to provide valid IQ testing showing IQ at the listing level prior to age 22. (*Id.* at 13-17). The Commissioner responds that POMS is not binding, Stephenson's attendance in special education classes does not mandate a listing equivalency finding, and the medical evidence and Stephenson's and third-party reports of his activities are inconsistent with deficits in adaptive functioning. (Def. Br. [10] at 5–9).

DI 24515.056 from POMS provides:

Listing 12.05C is based on a combination of an IQ score with an additional and significant mental or physical impairment. The criteria for this paragraph are such that a medical equivalence determination would very rarely be required. However, slightly higher IQ's (e.g., 70-75) in the presence of other physical or mental disorders that impose additional or significant work-related limitation of function may support an equivalence determination. It should be noted that generally the higher the IQ, the less likely medical equivalence in combination with another physical or mental impairment(s) can be found.

The ALJ must consider the POMS, but is not binding on the Commissioner. *Shontos v. Barnhart*, 328 F.3d 418, 424 (8th Cir. 2003); *Walker v. Massanari*, 149 F. Supp. 2d 843, 847 (S.D. Iowa 2001)(POMS can be "persuasive authority in unique situations"). While the ALJ did not

specifically reference the POMS in her discussion, she did address the argument that Stephenson met or equaled listing 12.05. (AR at 19–20). In her discussion, she specifically referenced factors covered by DI 24515.056, such as Stephenson's functioning before age 22 and extensive discussion of the consulting psychologist's report. (*Id.* at 19–20). Although she did err in requiring Stephenson to provide valid IQ testing prior to age 22, it is true that attendance in special education classes does not mandate a listing equivalency finding. *Scott v. Berryhill*, 855 F.3d 853, 856 (8th Cir. 2017); *Cheatum v. Astrue*, 388 Fed. App'x. 574, 576 (8th Cir. 2010). The ALJ did not specifically reference Stephenson's adolescent history of behavior problems, but by discussing the report of the consulting psychologist, who did discuss his history in some detail (*id.* at 373, 453), the Court can infer that she was aware of his behavioral history prior to age 22 and took that into account in making her findings. *See Wildman v. Astrue*, 596 F.3d 959, 966 (8th Cir. 2010) ("[a]n ALJ's failure to cite specific evidence does not indicate that such evidence was not considered" (quoting *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998)). The ALJ found parts of Dr. Kent's examination of Stephenson significant: that Stephenson did not have problems with attention span during the interview; that testing showed problems with attention and concentration and slow processing speed, but Stephenson did not appear to be impaired in understanding directions, only in remembering them; and Dr. Kent's observation that Stephenson had been able to work in a fast food job for almost a year, showing that "if he really wanted to, he is likely to get along, at least superficially, with supervisors, co-workers and exercise adequate judgment." (*Id.* at 20). She also noted that although Dr. Kent referred Stephenson for additional mental health treatment, Stephenson did not do so until his disability attorney referred him to Vera French where progress notes showed improvement with treatment. (*Id.* at 20, 391).

24

Additionally, the ALJ found that Stephenson's activities, as self-reported and reported by third parties, were inconsistent with deficits in adaptive functioning. Stephenson watched movies, washed dishes, cared for pets, took out trash, shopped in stores, attended wrestling events, knew how to do some cleaning and laundry and could pay bills and count change. He also played card and video games "all the time." (AR at 301).

On this record, the Court cannot say the ALJ failed to assess whether Stephenson equaled the listing for intellectual disability at Step Three; in fact, the records support a finding the ALJ did conduct an equivalency assessment[5] and correctly concluded the criteria were not met.

B.    RFC/Hypothetical Mental Limitations

Stephenson next argues (1) that the ALJ erred in omitting limitations in concentration, persistence or pace from the RFC and hypothetical to the VE and (2) the social interaction limitation submitted to the VE did not fairly account for Stephenson's limitations or comport with the weight the ALJ gave to the opinions of the consulting psychologists. The Commissioner counters (1) the ALJ was not required to include the concentration, persistence, or pace limitations in her RFC assessment or hypothetical and (2) the ALJ did not have to adopt all limitations suggested by the physicians, even if the opinions were accorded "significant weight." (Def. Br. [10] at 13).

In her Step Three analysis, the ALJ found that Stephenson had moderate difficulties with regard to concentration, persistence, or pace. (AR at 18). The ALJ's hypothetical question to the VE asked the VE to assume

> . . . this individual would be limited to tasks that can be learned within 30 days that are routine and repetitive in nature. Additionally, this individual should be in an

[5] In view of the finding the ALJ undertook an equivalency evaluation, the Court does not address the arguments regarding Stephenson's activities as inconsistent with deficits in adaptive functioning.

environment that is free of hourly production quotas, although there might be a
production expectation by the end of the shift or day.

(AR at 70). These limitations were included in the RFC. (*Id.* at 21). In response, the VE testified

there would be jobs available as industrial cleaner, laundry worker I, and router. (*Id.* at 70-71). On

cross-examination, the VE testified the hypothetical did not include limitations in maintaining

concentration, persistence or pace. (*Id.* at 73). There was no testimony from the VE concerning the

effect such limitations might have on a claimant's employability.

In arguing the ALJ erred in omitting those limitations from the RFC and hypothetical to

the VE, Stephenson asserts POMS DI 25020.010, which lists the mental demands of unskilled

work, is binding on the ALJ's assessment of Stephenson's abilities to perform the mental

requirements of unskilled work at Step Four. (Pl. Br. [9] at 26). Those mental demands include:

> the abilities (on a sustained basis) to:
> - understand, carry out, and remember simple instructions;
> - make judgments that are commensurate with the functions of unskilled
>   work, i.e., simple work-related decisions.
> - respond appropriately to supervision, coworkers and work situations; and
> - deal with changes in a routine worksetting.

DI 25020.010 (A)(3)(a). Again, POMS are not binding on the Commissioner. *Shontos*, 328 F.3d

at 424.

Additionally, "impairments found at Step Two or Step Three, whether severe or not, should

be considered while formulating the RFC but do not automatically translate into limitations on the

claimant's ability to work." *Gann v. Colvin*, 92 F. Supp. 3d 857, 885 (N.D. Iowa 2015)(citing

cases)(quote from report and recommendation, which was affirmed by the district court).

> In evaluating the severity of Plaintiff's mental impairments at step two and three,
> the ALJ use[s] the "special technique" set out in 20 C.F.R. § 404.1520a. The
> purpose of this technique is to evaluate the severity of the claimant's mental
> impairments to determine whether they meet or equal a listing, not to determine
> Plaintiff's RFC 20 C.F.R. § 404.1520a(d). Indeed, Social Security Ruling 96-8p
> specifically cautions that an ALJ "must remember that the limitations identified in

the 'paragraph B' and 'paragraph C' criteria are not an RFC assessment but are used to rate the severity of mental impairments] at steps 2 and 3 of the sequential evaluation process." This is because the ALJ's RFC determination "requires a more detailed assessment" than the special technique provides.

*Crane v. Colvin*, No. 4:13-046-DGK-SSA, 2014 WL 460858, at *4 (W.D. Mo. Feb. 5, 2014)(quoting *Lacroix v. Barnhart*, 465 F.3d 881, 888 n.3 (8th Cir. 2006)). "Moreover, the hypothetical question need not frame the claimant's impairments in the specific diagnostic terms used in medical reports, but instead should capture the 'concrete consequences' of those impairments." *Lacroix*, (quoting *Roe v. Chater*, 92 F.3d 672, 676–77 (8th Cir. 1996)); *see also Howard v. Massanari*, 255 F.3d 577, 582 (8th Cir. 2001)("ALJ's hypothetical concerning someone who is capable of doing simple, repetitive, routine tasks adequately captures Howard's deficiencies in concentration, persistence or pace").

The ALJ discussed the psychological medical evidence that supported the reduced mental residual functional capacity she assessed. (AR at 23). Specifically, Stephenson was alert and oriented at most of his mental status examinations, with logical and goal-directed thoughts and normal attention and concentration. (*Id.* (citing 1F/3, 1F/5-6; 2F/2; 4F/3; 5F/6; 5F/12; 5F/15; 5F/28). On the few occasions when he appeared disheveled, depressed, and/ or anxious (2F/2, 5F/6, 5F/12), Stephenson still had immediate recall, understandable speech, goal-directed and/or logical thought processes, with moderate problems with delayed recall and working memory. While in December 2014 Stephenson appeared to be in distress after not taking his medications, (5F/23), by January 2015 he "had a neutral mood, full affect, normal speech, logical thought processes, and normal attention and concentration (5F/28)." These findings together with Stephenson's medical records, which indicated he "was often cooperative with appropriate behavior, normal speech, and good eye contact" (2F/2;4F/2-3; 5F/6; 5F/12; 5F/15; 5F/18-19; 5F/28), and his testimony that he participated in poker games with neighbors "showed some ability

to focus and concentrate and socialize." (AR at 23). The ALJ's limitations were not phrased in diagnostic terms, but in terms of the "concrete consequences" of Stephenson's impairment— "limited to tasks that can be learned within thirty days that are routine and repetitive in nature; individual should be in an environment that is free of hourly production quotas all though [sic] there might be a production expectation by the end of a shift or day." (*Id.* at 21). *See Hosch v. Colvin*, No. C15-2014-CJW, 2016 WL 1261229, at *5 (N.D. Iowa March 30, 2016)("The Eighth Circuit Court of Appeals and several district courts have held that moderate limitations in concentration, persistence, or pace are consistent with the simple, routine, repetitive tasks involved in unskilled work," citing cases); *Stumon v. Colvin*, No. 4:14-cv-00306-NKL, 2014 WL 7049287, at *8 (W.D. Mo. Dec. 11, 2014)(hypothetical limiting claimant to "simple, routine and repetitive tasks, and work that did not require complex written communication or more than simple math" was sufficient to account for claimant's borderline intellectual functioning where evidence also showed Stephenson did all his own cooking, cleaning, laundry, yard work, took his own medication, attended doctor appointments, played pool, went swimming, played basketball, watched television, and took care of his mother); *but see Roberts v. Colvin*, 3:14-cv-103-JAJ-CFB, Order 6, ECF No. 12 (S.D. Iowa Jan. 19, 2016)(omission of limitation on concentration, persistence, or pace was not supported by substantial evidence where the record was "replete" with evidence from multiple medical and third-party sources plaintiff struggled with memory and concentration).

Based on this record, the Court cannot say the ALJ erred in omitting limitations on concentration, persistence, and pace from the RFC or the hypothetical to the VE in this case.

The ALJ also included a social interaction limitation in the RFC—"limited to no more than occasional interaction with the general public, coworkers or supervisors." (AR at 21). Stephenson

argues this limitation was inadequate, pointing to the ALJ's Step Three findings of moderate difficulties in social functioning, (*id.* at 18), and her assignment of "great weight" to the opinions of Dr. Roger Mraz and the state agency psychological consultants (*id.* at 24–25) as being inconsistent with the limitation as phrased. (Pl. Br. [9] at 29). Specifically, Stephenson argues the limitation does not account for his intermittent explosive disorder and its potential effect on employability, as testified to by the VE. (*Id.* at 72–74).

In his report, Dr. Mraz noted Stephenson's history of "problems with anger control and reported symptoms of an Intermittent Explosive Disorder in the current evaluation," which had "impacted negatively on his employability, as he has had difficulty getting along with supervisors, coworkers, and the public." (AR at 375). This was not offered as a limitation, but as a summary of Stephenson's history and disorders; no limitations with respect to anger control were suggested. Dr. Mraz noted that Stephenson was "able to remember and carry out simple instructions," but did not handle stress well and preferred routine. (*Id.*) Drs. Quinn and Tashner, the state agency psychological consultants, after reviewing Dr. Mraz's report, gave the opinions that Stephenson was "able to complete simple, repetitive tasks in a sustained manner," would have "difficulties following detailed instructions, sustaining attention/concentration, maintaining pace, maintaining interpersonal functioning." (*Id.* at 90, 121).

At hearing, in addition to the hypothetical previously discussed, the ALJ asked the VE:

Q. If due to an anger issue the individual would be limited to no more than occasional interaction with the general public, coworkers or supervisors, how does that affect the, the three jobs that are identified in hypothetical three, the router, the office helper and the routin[g] clerk?
A. Those jobs are still done with occasional or less contact.

(AR at 72–73). On cross-examination, counsel asked:

Q. . . . If we got a person who because of answer or, or whatever the cause is not going to be able to respond appropriately to criticism from a supervisor or to accept

> instructions on a consistent basis, there will be ongoing problems in those two areas
> longitudinally over the long haul, even though it's not often, even though it might
> not be every month, it's ongoing. What, what—how is that going to affect work
> over time?
> A.  Though they might get one or, one or maybe two warnings, but if they don't
> accept the work or accept the criticism then the supervisor would let, let them go.

(*Id.* at 73–74). The difference between the two hypotheticals is that the ALJ's hypothetical had a factual basis in the report of Dr. Mraz; counsel's hypothetical had no factual basis.

As discussed *supra*, the ALJ's Step Three findings do not automatically translate into RFC findings. *Gann*, 92 F. Supp. 3d at 885. Additionally, while "the ALJ must consider the record as a whole; he is not required to adopt, in totality, the opinions of any medical provider—even those he considers worthy of 'considerable weight.'" *Salih v. Colvin*, 4:11CV3218, 2013 WL 1411694, at *2 (D. Neb. Apr. 8, 2013). The limitation given by the ALJ—"limited to no more than occasional interaction with the general public, coworkers or supervisors"—is not inconsistent with the opinions of Dr. Mraz or the state agency consultants, none of whom offered limitations concerning Stephenson's intermittent explosive disorder, and captures the "concrete consequences" of Stephenson's impairment by limiting his contact with others. Additionally, the limitation that Stephenson's work should be free of hourly production quotas addresses the "concrete consequences" of Stephenson's problems handling stress. The ALJ noted that Stephenson was often cooperative in counseling "with appropriate behavior, normal speech, and good eye contact (2F/2; 4F/2-3; 5F/6; 5F/12; 5F/15; 5F/18-19; 5F/28)" although "at times, he was anxious, depressed and disheveled with a flat affect and pressured speech. (2F/2; 5F/5-6; 5F/12; 5F/23)." (AR at 24). He also observed that in a Third Party Function Report from Connie Good, she said Stephenson spent time with and had no problem getting along with others, which the ALJ treated as evidence from "other sources" to show the severity of Stephenson's impairment and how his ability to function was affected. (*Id.* at 25).

The ALJ properly considered the opinion evidence in assessing the RFC in conjunction with the record as a whole and was not required to adopt the precise language offered by Dr. Mraz and the state agency consultants regarding Stephenson's mental limitations.

C.      Sit/Stand Limitations

Finally, Stephenson argues the ALJ erred "in failing to state with the required specificity how often Mr. Stephenson needs to alternate between sitting and standing." (Pl. Br. [9] at 35). In the RFC the ALJ noted:

> individual needs the opportunity to alternate between sitting and standing, if standing they need to be able to sit, if sitting they need to be able to stand, and the frequency of the alternation would need to happen at least one time every hour through the course of an eight-hour workday but they remain in the position for five minutes for tasks that might be designated; . . . .

(AR at 21). This limitation was based on Stephenson's hearing testimony that he could stand for one hour and sit for one hour. (*Id.*) SSR 96-9p indicates that "[t]he RFC assessment [with respect to sitting and standing] must be specific as to the frequency of the individual's need to alternate sitting and standing." As The Commissioner points out, this SSR relates to sedentary work; the RFC in this case is for light work. Therefore, the SSR does not apply. *Vititoe v. Colvin*, 549 Fed. App'x. 723, 731 (10th Cir. 2013).

Even if the SSR applied, the ALJ clearly specified the frequency with which Stephenson must alternate sitting and standing. Generalized "at will" sit/stand options satisfy the specificity requirements of SSR 96-9p, *Davis v. Apfel*, 239 F.3d 962, 966 (8th Cir. 2001), and the sit/stand limitation articulated here, one or the other at least once each hour for five minutes, if much more specific. The ALJ committed no error with respect to the specificity of alternating sit/stand options for Stephenson.

## V.      REPORT AND RECOMMENDATION AND ORDER

After a thorough review of the entire record in accordance with the deferential standard of review, the Court concludes that the ALJ's determination that Mr. Stephenson was not disabled within the meaning of the Act is supported by substantial evidence in the record when viewed as a whole. The decision of the ALJ should be affirmed. The undersigned recommends entry of judgment in favor of the Defendant and against Stephenson dismissing the Complaint.

IT IS ORDERED that the parties have until **March 22, 2018** to file written objections to the Report and Recommendation, pursuant to 28 U.S.C. § 636(b)(1). *Thompson v. Nix*, 897 F.2d 356, 357 (8th Cir. 1990); *Wade for Robinson v. Callahan*, 976 F. Supp. 1269, 1276 (E.D. Mo. 1997). Any objections filed must identify the specific portions of the Report and Recommendation and relevant portions of the record to which the objections are made and must set forth the basis for such objections. *See* Fed. R. Civ. P. 72; *Thompson*, 897 F.2d at 357. Failure to timely file objections may constitute a waiver of a party's right to appeal questions of fact. *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Griffini v. Mitchell*, 31 F.3d 690, 692 (8th Cir. 1994); *Halpin v. Shalala*, 999 F.2d 342, 345 & n.1, 346 (8th Cir. 1993); *Thompson*, 897 F.2d at 357.

**IT IS SO ORDERED.**

Dated March 8, 2018.

Helen C. Adams
Chief U.S. Magistrate Judge